IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 16, 2019

## CHAD RAY THOMPSON v. STATE OF TENNESSEE

Appeal from the Circuit Court for Warren County
No. F-13595    Larry B. Stanley, Jr., Judge

_____

No. M2018-01074-CCA-R3-PC

_____

The Petitioner, Chad Ray Thompson, appeals from the denial of his petition for post-conviction relief, wherein he challenged his jury convictions for first degree premeditated murder, first degree felony murder, and facilitation of especially aggravated robbery. On appeal, the Petitioner alleges that he received ineffective assistance at trial due to trial counsel's (1) failure to seek funding for an investigator and adequately prepare for trial; (2) failure to call certain witnesses; and (3) failure to file any pretrial motions or object at trial to exclude evidence. He also submits that the cumulative effect of these errors deprived him of a fair trial. After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Brandon J. Cox, Smithville, Tennessee, for the appellant, Chad Ray Thompson.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; and Lisa S. Zavogiannis, District Attorney General, for the appellee, State of Tennessee.

## OPINION
FACTUAL BACKGROUND

The February 2012 term of the Warren County Grand Jury charged the Petitioner with first degree premeditated murder, first degree felony murder, and especially aggravated robbery in connection with the death of the Petitioner's cousin, Tracy Allen Martin ("the victim"). See Tenn. Code Ann. §§ 39-13-202, -403. Following a jury trial, the Petitioner was convicted of first degree premeditated murder, first degree felony

murder, and facilitation of especially aggravated robbery.  See State v. Chad Ray Thompson, No. M2015-01534-CCA-R3-CD, 2016 WL 7010921, at *1 (Tenn. Crim. App. Dec. 1, 2016), perm. app. denied (Tenn. Mar. 8, 2017).  Thereafter, the murder counts were merged into a single conviction, and the Petitioner's thirty-year sentence for facilitation was ordered to run concurrently with his life sentence.  Id. at *8.

The State presented the following evidence at the Petitioner's trial.  See generally Thompson, 2016 WL 7010921.  The victim was last seen alive at a local McMinnville Walmart on November 17, 2011.  The security footage from Walmart showed that the victim entered Walmart around 2:30 p.m. wearing a yellow sweatshirt and navy-blue jogging pants and that he purchased, with cash, a box of Winchester .38 Special target ammunition and a laser sight.

Teresa Thompson, the Petitioner's mother, and also the victim's aunt, reported the victim missing on November 19, 2011.  The following day, on November 20, 2011, the victim's body was discovered partially submerged on a creek bank on a Warren County farm.  When discovered, "[t]he victim was wearing a yellow shirt, 'blue jogging pants[,]' and a wedding band."  Thompson, 2016 WL 7010921, at *2.  Once the victim was removed from the water, his pockets were checked for personal belongings, and the victim had "absolutely nothing on him other than that wedding band and a watch[.]"  Id.

Pertinent findings at autopsy were that the victim suffered from multiple blunt force injuries to the back and right side of the victim's head with two depressed skull fractures, subdural hemorrhages, and contusions of the brain.  The toxicology report indicated the presence of methamphetamine and amphetamine in the victim's system.  The forensic pathologist determined that the cause of death was multiple blunt force injuries to the victim's head and that the manner of death was homicide.  The forensic pathologist also concluded that the victim "probably died around" November 18 or 19, 2011, but was unable to determine the time of death with greater specificity.  According to the pathologist, the victim was bludgeoned with a "hard, heavy object swung with some force," and the object "would have [had] at least a semi-circular edge on one side."  When asked if it were possible that the victim could have been hit "with a handle of pistol," the forensic pathologist replied, "No.  Unless the pistol has a spherical grip, a round grip to it and it has to be—pistol grips typically are plastic or wood.  I would expect something more dense and hard than a pistol grip."  However, the forensic pathologist acknowledged that some pistol grips are circular.

Prior to his death, the victim was unable to maintain employment due to mental illness, so he enrolled for Social Security disability benefits.  The victim eventually was awarded a lump sum disability payment of about $20,000.  About $12,000 remained when Ozella Craven was appointed as the new payee for the Petitioner's benefits.  Ms. Craven testified that the victim "showed up at [her] house" approximately one to two

-2-

weeks before his death. Thompson, 2016 WL 7010921, at *1. Ms. Craven understood that the victim wanted to move to the McMinnville area to be closer to his children and intended on staying with the Petitioner. Ms. Craven, in her capacity as payee, received a check in the amount of $11,711.12 made out to the order of herself and the victim. She cashed the check and gave the money to the victim. However, the victim counted out $1,300 and gave the rest back to Ms. Craven. Ms. Craven clarified that she did not count the money the victim had given her and did not know how much he had actually taken; she simply trusted him when he said that he took $1,300. In addition, Ms. Craven had purchased a handgun for the victim, which she gave to him just prior to his going missing.

Sometime later, Tonya Debuty, the victim's sister, received a call from the Petitioner's mother, informing her that the victim was missing. The victim's sister testified that during that conversation, she also spoke with the Petitioner, who asked about the whereabouts of the victim's money. According to Ms. Craven, she also received a call from the Petitioner's mother, and the Petitioner's mother told her that the victim had left her house with his money, gun, and two boxes of Sudafed and that she was worried.

The victim's sister acknowledged that she knew the victim "had a methamphetamine habit" and that "he was hanging around with the wrong kind of people[.]" Thompson, 2016 WL 7010921, at *1. Additionally, the Petitioner's mother stated that she did not know of any "bad blood" between the victim and the Petitioner.

Officer Brad Hall of the McMinnville Police Department responded to the missing person call. After speaking with the Petitioner and the Petitioner's mother, Officer Hall did not take a formal report because the Petitioner gave Officer Hall the impression that "it wasn't unlike [the victim] to just pick up and move, leave town." Thompson, 2016 WL 7010921, at *2. Officer Hall issued a "be on the lookout" ("BOLO") call for the victim. Id.

Ms. Craven recalled that she saw the Petitioner at the victim's funeral. There, the Petitioner told Ms. Craven that the victim had said he kept his money in a lock-box at Ms. Craven's home, and he asked Ms. Craven if she still had it.

Mary Alvarado testified that she worked at Perry's Country Market in McMinnville. Ms. Alvarado noted that the Petitioner had come to her store around 5:00 p.m. on November 17, 2011, and paid for his purchase with a $100 bill.

Destry Cobb and Scott Muncey testified at the Petitioner's trial. They both implicated the Petitioner in the victim's murder:

-3-

Destry Cobb testified that he lived with Scott Muncey and that he was a friend of the [Petitioner]. Mr. Cobb admitted that he had prior charges for manufacturing a controlled substance and assault. Mr. Cobb recalled that the [Petitioner] would visit his apartment "[a]t least every other day." Around November 2011, the [Petitioner] asked Mr. Cobb and Mr. Muncey to "help[] him rob somebody." The [Petitioner] told Mr. Cobb that the intended target had $30,000 and that he planned to rob the target at Harrison Ferry. When asked how the robbery would happen, Mr. Cobb said, "I believe in a moving truck. They would be together. He asked us to assault him also and make it look good and that was pretty much the details." Mr. Cobb refused to help the [Petitioner].

Mr. Cobb also recalled that, the day after his conversation with the [Petitioner], Mr. Muncey called him "and said that he had a gun for $75 that it was a .38." Mr. Cobb then called his uncle, Buford Tucker, who agreed to buy the gun for $135. The [Petitioner] brought the gun to Mr. Cobb's apartment, and Mr. Cobb gave him $75. During the transaction with the [Petitioner], Mr. Cobb spoke with the [Petitioner] about the murder, and Mr. Cobb recalled, "[The Petitioner] told me it got out of hand one time and another time he told me that he had to kill him." Mr. Cobb also recalled that he paid the [Petitioner] cash for the gun and that the [Petitioner] had approximately $1,000 in cash in his wallet at that time. Mr. Cobb stated that he never knew the [Petitioner] to have that much money on him. Mr. Cobb, in turn, sold the gun to Mr. Tucker for the agreed-upon $135. Later, Mr. Cobb learned that a body had been found in a river, and he worried that the person may have been killed with the .38 he had sold to Mr. Tucker, and he tried to get the gun back so that his uncle did not get into trouble.

Mr. Cobb confirmed that he had spoken with police and that the [Petitioner] had called him during that interview. That phone call was recorded. During that phone call, Mr. Cobb told the [Petitioner] that the police had been to Mr. Tucker's house looking for Mr. Cobb. He also told the [Petitioner] that investigators had already picked up the gun from Mr. Tucker. The [Petitioner] said he did not want to talk on the phone, which Mr. Cobb understood to mean the [Petitioner] was nervous.

On cross-examination, Mr. Cobb admitted that he had a prior conviction for manufacture, delivery, or sale of methamphetamine and that he still used methamphetamine at the time of trial. Mr. Cobb stated that he was afraid that Mr. Muncey would be charged in connection with the

victim's death. Mr. Cobb also admitted that he used methamphetamine the day before the [Petitioner] asked for assistance in the robbery. Mr. Cobb confirmed that he had not been charged with the offense of methamphetamine use or felon in possession of a handgun for his actions around the time of the victim's death. Mr. Cobb also admitted that methamphetamine use impaired his memory. Mr. Cobb affirmed that he did not speak with police until February 6, 2012. He explained the he delayed speaking with people because "[n]o one was in trouble." Mr. Cobb denied telling someone named Jamie Nichole Powell "that she needed to keep her mouth shut or she [would] be found in the river like Tracy [Martin]."

Scott Muncey testified that he had known the [Petitioner] for approximately fifteen years. Mr. Muncey stated that Mr. Cobb was living with him in November 2011. Mr. Muncey estimated that Mr. Cobb lived with him for five to six months, but he could not state specifically how long Mr. Cobb lived with him because he was using methamphetamine at the time, which caused his concept of time to "blur[]." However, Mr. Muncey recalled that, in November 2011, the [Petitioner] told him that he "knew someone that was getting a $35,000 settlement" and who liked methamphetamine. The [Petitioner] told Mr. Muncey that he planned to steal the money and make it appear as if a drug deal had gone bad. Mr. Muncey later learned that the intended target was the [Petitioner]'s cousin.

The [Petitioner] asked for Mr. Muncey's and Mr. Cobb's assistance in robbing the victim, but Mr. Muncey refused. The [Petitioner] became angry and left. A short time later, the [Petitioner] returned and told Mr. Muncey that the intended victim "was only going to have five grand on him" and that they needed to act quickly because "his cousin [was] going through the money." Mr. Muncey again refused to participate in the planned robbery. The [Petitioner] responded that "he'd just go kill him then and do it himself." The [Petitioner] left angry.

"[A] couple or three days" after that conversation, the [Petitioner] sent Mr. Muncey a photo of a .38 Special, and Mr. Muncey agreed to purchase the gun. Mr. Muncey planned to sell the gun to a man he knew as "Uncle." Mr. Muncey paid seventy-five dollars for the gun, and Mr. Cobb acted as "the middle man" in the transaction. At the time of the transaction, Mr. Muncey was not aware of the gun "being involved in anything."

A few days after the transaction, the [Petitioner] came to Mr. Muncey's apartment dressed "in his Sunday best[.]" The [Petitioner] told

Mr. Muncey that he was on his way to his cousin's funeral. The [Petitioner] also told Mr. Muncey that he had "thr[own] a hammer beside [Mr. Muncey's] apartment" and that "he needed to find it because it ha[d] his old lady's initials on it." Mr. Muncey did not understand why the [Petitioner] was talking about a hammer, and he "felt like [the Petitioner] maybe was setting [him] up for something." Mr. Muncey also reported that "the girl" found a pair of coveralls and a pair of slippers in his apartment and that "the girl" said she had seen the [Petitioner] wearing them. "The girl" is not identified in the record. Mr. Muncey stated that the clothes were sized "at least 4X, 3 to 4X" and did not fit him. Additionally, after the gun transaction, Mr. Muncey noticed that the [Petitioner] began to visit him more often and for longer periods of time, and Mr. Muncey felt that the [Petitioner] was "keeping an eye on [him.]" Mr. Muncey called his stepfather and told him that he was concerned that "dude's setting me up for murder." Mr. Muncey and his stepfather searched the area around Mr. Muncey's apartment for a hammer but did not find one.

Mr. Muncey also recalled that he asked the [Petitioner] if anyone else knew what the [Petitioner] had done, and the [Petitioner] responded that only he and Mr. Muncey knew what happened. Mr. Muncey noted that the [Petitioner] never explicitly said that he killed his cousin. However, Mr. Muncey "put it together" when he learned that the [Petitioner's] cousin bought a .38 Special, which Mr. Muncey understood to be the same gun the [Petitioner] sold him. Additionally, the [Petitioner] admitted that he "pushed him over" and "said a statement like, [']you don't know what it feels like to feel a man's, like his bones crush underneath your fists[.']"

Mr. Muncey admitted that he was currently serving time for felon in possession of a handgun. Mr. Muncey stated that he knew the consequences of his having a gun, but he explained that he got the gun to protect himself from the [Petitioner]. Mr. Muncey also admitted that he did not contact law enforcement even though he thought the [Petitioner] was setting him up for the murder. Mr. Muncey explained he was afraid the [Petitioner] would learn he had contacted law enforcement and would retaliate against Mr. Muncey's family. Mr. Muncey also admitted that he spoke to law enforcement after he was arrested in an attempt to receive leniency.

On cross-examination, Mr. Muncey stated that he was arrested after police executed a search warrant at his apartment and discovered "a couple of guns." Mr. Muncey also admitted that he did not talk to law

-6-

enforcement until after the search warrant was served. Mr. Muncey eventually pled guilty to the firearms charge, and his testimony for this case was "[taken] under consideration" during the plea. Mr. Muncey admitted that he would like to have his sentence reduced as a result of his testimony in this case. Additionally, Mr. Muncey stated that he had been addicted to methamphetamine for "a very long time" and that he made his own methamphetamine. However, Mr. Muncey said he had never met the victim and that he was not aware that the victim's autopsy revealed that he had methamphetamine in his system.

Thompson, 2016 WL 7010921, at *3-5 ("Defendant" altered to "Petitioner" throughout; all other alterations in original).

State Investigator Jason Rowland took a statement from Buford Tucker, who had passed away prior to the Petitioner's trial. Mr. Tucker relayed the following:

Sometime in November Destry Cobb sold me a .38 Special with a [two]-inch barrel. It was a Charter Arms. I gave him $130.00 for it and I sold it to Wendell Smartt. [Mr. Cobb] came back about a week or so later and wanted to get it back. He wanted to burn it or melt it down. He said it was involved in something bad. I told him Wendell had it in Beersheba and not to worry about it.

Thompson, 2016 WL 7010921, at *2. Investigator Rowland then met Wendell Smartt and obtained the .38 Special Charter Arms revolver.

The day after the victim's body was discovered, the victim's sister spoke with the Petitioner by phone. The conversation was recorded. During the conversation, the Petitioner indicated that the victim had sustained injuries to the back of his head, and he knew that the police had taped off the location where the victim's body was found. However, at the time of the interview, law enforcement had not released information about the manner of the victim's death, where his wounds were located, or what type of wounds they were. Moreover, Chief Investigator Marc Martin of the Warren County Sheriff's Department "explained that you could not see the tape from the road, so in order to know that information, the [Petitioner] would have 'had to [drive] nearly a half mile through this nursery field to see that [the police] had the crime scene taped off.'" Thompson, 2016 WL 7010921, at *5 ("Defendant" altered to "Petitioner"; all other alterations in original). Investigator Martin acknowledged that in the phone call with the victim's sister, the Petitioner also repeated the rumor that the victim had been shot in the head.

-7-

On February 1, 2012, David George, Mr. Muncey's stepfather, received a call informing him that police were at Mr. Muncey's apartment. When Mr. George arrived at apartment, he encountered the Petitioner and the Petitioner's girlfriend, and Mr. George was surprised to see the Petitioner there. After Mr. George told the Petitioner that Mr. Muncey had been arrested on a gun charge, the Petitioner, in Mr. George's opinion, appeared concerned and "wanted to know what kind of gun it was[.]" Thompson, 2016 WL 7010921, at *5. Mr. George testified that over the following week while he was packing Mr. Muncey's belongings, the Petitioner came to Mr. Muncey's apartment "[f]ive or six times," continuously asking about the nature of the charges against Mr. Muncey. Id.

Debbie George, Mr. Muncey's mother, testified that on the night Mr. Muncey was arrested, the Petitioner and his girlfriend came to Mrs. George's house for the Petitioner to "pay [his] respects" and also to give Ms. George the "phone chip" out of Mr. Muncey's phone. Thompson, 2016 WL 7010921, at *5. When Ms. George asked if there was anything on the SD card, the Petitioner responded that "the card had contained some photos but that he had erased everything that was on there." Id. According to Ms. George, the Petitioner also asked about a pistol.

Captain James Ramsey recalled that he retrieved a phone SD card from Ms. George but that he was unable to retrieve any information from the SD card. Furthermore, Captain Ramsey testified that he accompanied officers to the Petitioner's mother apartment to inform her that the victim's body had been found. The next day, Captain Ramsey returned to the apartment to interview the Petitioner's mother. According to Captain Ramsey, the Petitioner came into the apartment "very irate," "start[ed] screaming," and asked why the police were interrogating his mother. Thompson, 2016 WL 7010921, at *5. The Petitioner also tried to view the notes that Captain Ramsey was taking during the interview.

Investigator Martin testified that during the course of the investigation, wherever Investigator Martin went, the Petitioner "would be lurking in the shadows" "trying to figure out what was going on, who [they] were talking to, and what [they] were finding out." Thompson, 2016 WL 7010921, at *6. Once, Investigator Martin approached the Petitioner and "talked to him for just a second[.]" Id. According to Investigator Martin, the Petitioner appeared nervous and "was just shaking all over" during this encounter. In addition, the Petitioner also had Investigator Martin's cell phone number and called him numerous times during the investigation. Some of those calls were recorded and played for the jury.

Investigator Steven Carpenter of the Warren County Sheriff's Department went to the apartment complex where the Petitioner lived to "pick up" the Petitioner's sister. Thompson, 2016 WL 7010921, at *7. Upon arrival, someone at the apartment complex

told them that "a guy took off running." Id. Investigator Carpenter and two other officers walked in the direction where the man had pointed, and they saw the Petitioner standing in a breezeway. When the Petitioner saw the officers, he took "took off running" again, and the officers gave chase, eventually locating the Petitioner "ducked down in the weeds and bushes." Id. Investigator Carpenter asked the Petitioner why he ran, and the Petitioner responded, "[Y]'all are here to get me." Id.

Investigator Martin recalled that federal agents "raid[ed]" Mr. Muncey's apartment on February 1, 2012. Thompson, 2016 WL 7010921, at *6. Investigator Martin saw the Petitioner park his car in the parking lot across from Mr. Muncey's apartment and watch the officers conduct the raid. Investigator Martin noted that after Mr. Muncey was arrested, "it was like [the Petitioner] disappeared," and the Petitioner even changed his phone number. Id. ("Defendant" altered to "Petitioner").

Investigator Martin also confirmed that the victim's autopsy revealed that he had methamphetamine in his system. Investigator Martin indicated that both Mr. Cobb and Mr. Muncey were "in the meth business" and that he "looked into" Mr. Cobb and Mr. Muncey in connection with the victim's murder. Thompson, 2016 WL 7010921, at *6. Investigator Martin stated that he believed the victim was killed at the scene after being taken there in the Petitioner's car.

Several months after the victim's death, a sledge hammer, which tested positive for blood, had been found in the woods near Mr. Muncey's apartment. The hammer "was consistent with the type of object that would have inflicted the victim's injuries." Thompson, 2016 WL 7010921, at *8. The name "Nina" was scratched into the head of the hammer, and the Petitioner's girlfriend's name was Nina Parker. However, the hammer had been exposed to the elements "for some period of time." Id. at *7. Tests failed to indicate the presence of human DNA, so no DNA profile was obtained.

Investigator Rowland intercepted mail sent between the Petitioner and Ms. Parker while the Petitioner was in jail. In one letter, the Petitioner wrote to Ms. Parker:

> Do you remember me sayin[g] something about what might be in the short weeds over by[] you know where? See if you can get that one guy that is like lighting [sic] in the woods [to] go over there [and] look around. Get rid of it, only cause it[']s got [your] name on it. It just needs [to] be found. If they would have found it then we would've already known. He tossed it by the trailer that was once used [for] an office. J-Pa's pond/lake would be a good place [for] it.

Thompson, 2016 WL 7010921, at *8.

Investigator Rowland also listened to recorded phone calls the Petitioner placed from the jail to Ms. Parker.

> In one phone call, the [Petitioner] asked Ms. Parker if she remembered "what [he] told [her] at, remember in the weeds?" He also told her to tell her "daddy [to] go look" and to look "thoroughly." He also noted that the object was "just right up there out of the way[.]" In another call, the [Petitioner] told Ms. Parker to "call [her] daddy . . . about what [he] was [sic] telling [her] yesterday[.]" He also instructed her to "tell him to put a sticker on the window saying it's out of gas or something." He also instructed Ms. Parker to call her father immediately after she hung up with the [Petitioner] to "get him on it." In another call, the [Petitioner] instructed Ms. Parker to call her father and say she had something to tell him. He also told Ms. Parker, "Your name's on it. Your name's all over that toilet paper." He then said, "Hell, I just want a mother----r to g--damn find that roll of toilet paper, by God, just like you're fixing to find that roll of toilet paper, you know?" Ms. Parker responded, "Supposedly they've already got it," to which the [Petitioner] responded, "Oh, s---."

Thompson, 2016 WL 7010921, at *7 ("Defendant" altered to "Petitioner" throughout; all other alterations in original). Investigator Rowland opined that the Petitioner was not actually talking about a roll of toilet paper in the last conversation.

Investigator Rowland confirmed that he followed up on leads involving Mr. Cobb during the course of the investigation. However, he never interviewed Mr. Muncey. Based on his investigation, Investigator Rowland, like Investigator Martin, believed that the victim was killed at the scene where he was found. Investigator Rowland acknowledged that he did not know to whom the Petitioner was referring when the Petitioner said in the letter, "He tossed it by the trailer." Thompson, 2016 WL 7010921, at *7.

On March 23, 2017, the Petitioner filed a pro se petition seeking post-conviction relief, which was later amended following the appointment of counsel. In the amended petition, the Petitioner alleged, among other things,[1] that he received ineffective assistance in the following ways: (1) trial counsel "failed to spend adequate time with [the] Petitioner prior to trial in preparation for this case"; (2) trial counsel "failed to interview or subpoena witnesses in support of [the] Petitioner's defense"; (3) trial counsel "failed to request investigative services and improperly advised [the] Petitioner about the availability of such services"; (4) trial counsel "failed to object to hearsay evidence

---

[1] Although the Petitioner raised other grounds for relief in his petition, we will focus only on those issues that are the subject of this appeal.

provided by Scott Munc[e]y respecting an unknown and unidentified 'girl' that pointed prejudicial evidence toward [the] Petitioner without [the] Petitioner's ability to cross-examine or confront this witness"; and (5) trial counsel "failed to object or otherwise challenge evidence presented at trial that was prejudicial to the Petitioner[,]" specifically, "the failure to object to any and all evidence that was referenced by Scott Munc[e]y in relation to 'the girl,' i.e. the coveralls with blood." The post-conviction court held an evidentiary hearing on April 25, 2018.

At the post-conviction hearing, trial counsel testified that he had been practicing law since 1970 and that during that time, he had tried forty to fifty homicide cases. He was appointed to the Petitioner's case after the Public Defender's Office had to withdraw due to a conflict. A motion for discovery had already been filed in the Petitioner's case, and the Public Defender's Office gave trial counsel two boxes of discovery materials, which included a list of approximately 115 potential State witnesses, a "lot of discs," and approximately 200 pages of documents. Trial counsel indicated that the Petitioner's prior attorney "was very cooperative" and that they were able to discuss "theories of the case, the way to approach the case, that kind of thing." Trial counsel indicated that he had approximately seven months to prepare for the Petitioner's trial.

According to trial counsel, he reviewed the State's witness list with the Petitioner, and the Petitioner requested that trial counsel speak with specific individuals—"the main one" being Nina Parker, the Petitioner's girlfriend. According to trial counsel, the Petitioner's previous attorney, who "had done all kinds of work," had prepared "a list of every potential witness" and "had talked to some of" the witnesses as well. Trial counsel testified that he interviewed "several" of the witnesses from the State's list, including Ms. Parker and the Petitioner's mother. Trial counsel confirmed that he did not talk to all of the witnesses on the State's list. He averred, however, that he did read all of the witnesses' statements and that he spoke with the witnesses that "were critical to the defense," which he determined from reviewing the "investigative facts" and during his discussions with the Petitioner. Trial counsel explained that "[ninety] percent" of the potential testimony from the State's witnesses was either cumulative, irrelevant, or immaterial. For example, trial counsel stated that the witnesses from the fire department, the Tennessee Wildlife Resources Agency, and the Tennessee Bureau of Investigation ("the TBI") were involved in the discovery of the victim's body.

Trial counsel relayed that the defense theory was "that this was a meth-induced killing and that the likely suspects were Destry Cobb and Scott Muncey" and that the trial strategy was to attack the credibility of these two individuals. Trial counsel explained that the victim's toxicology report showed he had methamphetamine in his system, that both Mr. Cobb and Mr. Muncey were "notorious meth users," and that "there was no evidence at the time that [the Petitioner] was under the influence of meth."

-11-

Trial counsel thought it "was inconceivable . . . that this homicide took place out there where the body was found" and that the hammer "was then transported back" to the residence of Mr. Muncey and Mr. Cobb "and left there." Rather, trial counsel opined that it "was a reasonable theory" "the killing took place at the residence of" these two men and that there was insufficient evidence the Petitioner was at the residence at that time. Trial counsel acknowledged that it was difficult to identify any witnesses to establish the Petitioner's whereabouts because the precise date of the victim's death was undeterminable. Ultimately, trial counsel did not present any witnesses in the Petitioner's defense.

Trial counsel acquiesced that he did not file any pretrial motions in this case. Specifically, trial counsel was asked if he could have "sought more information" about the victim's time of death "by filing a motion for a bill of particulars." Trial counsel said that while he "could have filed additional motions" seeking that information, he had received the autopsy report and "it would have been extremely difficult, if not impossible, to have pinpointed the whereabouts of [the Petitioner] at all possible times when the [victim] was killed." Trial counsel averred that he tried to establish an alibi defense instead through speaking with the Petitioner, Ms. Parker, and "others as to where [the Petitioner] was and his connection with the [victim]." Trial counsel was unable to establish the Petitioner's whereabouts during the suspected time period of the victim's death, between November 17 and November 20 of 2011, after talking with these individuals. Although Ms. Parker was not called to testify at trial, trial counsel maintained that he had "numerous discussions" with the Petitioner about Ms. Parker.

Trial counsel recalled that Steve Gauger was the Petitioner's boss and agreed, that as such, Mr. Gauger "could have been a source of providing" information regarding the Petitioner's whereabouts. Although trial counsel remembered talking with the Petitioner about his employment, trial counsel did not speak with Mr. Gauger.

In addition, trial counsel confirmed that he did file a motion requesting an investigator to assist in the Petitioner's defense. Trial counsel took on the duty of working on the case by himself. At the time of the Petitioner's trial, trial counsel did not believe that he could have obtained funding for an investigator for a non-capital murder case. Trial counsel advised the Petitioner accordingly. However, trial counsel was aware of "some recent cases" that allowed funding for an investigator in non-capital cases based on principles of equal protection and due process. Trial counsel claimed that he had "researched that issue" and still did not believe that a motion for funds to obtain an investigator would have been granted in the Petitioner's case.

When asked what generally prompted him to seek investigative funding in a capital case, trial counsel responded, "Because there are certain developments that are mysterious to me, that are questionable, and I want to find out if those facts can be

verified." Trial counsel opined that an investigator would "definitely" have been beneficial in the Petitioner's case. Trial counsel stated that he felt that "one matter" was particularly "questionable," noting that it would have been helpful to have investigated "more thoroughly" the "background and behavior and the activities" of Mr. Cobb and Mr. Muncey. Trial counsel indicated that he talked with the Petitioner about these two witnesses "numerous times," but trial counsel was unable to speak with either Mr. Muncey or Mr. Cobb before trial or obtain any pertinent information from their associates.

Trial counsel testified that he did not find the proof about the Petitioner's buying things at Perry's Country Market with a $100 bill to be relevant. According to trial counsel, he and the Petitioner talked about the Petitioner's being seen with a $100 bill at the store. Trial counsel opined, "I suspect that we could have gotten collateral proof as to where he had gotten that $100 but that wasn't done." Trial counsel agreed that the State "made a big deal" about the $100 because "they had nothing else." In addition, trial counsel acknowledged that this court in its direct appeal opinion did find the event important. Trial counsel confirmed that despite knowing about this incident pretrial, he did not file a motion to suppress this evidence. Trial counsel also did not object to the evidence at trial or cross-examine the store clerk about the incident.

Trial counsel acknowledged that the State "tried to prove" at trial that the victim "was coming into a large sum of money and that the motivation was for [the Petitioner] to kill him to get the money." When asked what "steps or efforts did [he] make to track down where [the victim's] money was going," trial counsel said, "I didn't do it because there was no evidence [the Petitioner] ever got any of that money." Trial counsel indicated that he knew the Petitioner's financial situation "pretty well." However, trial counsel once again admitted that it was "something that was made a big deal [of] in the case."

Trial counsel testified that he did not find Ms. Craven's trial testimony that she purchased a gun for the victim to be relevant to the victim's murder or the identity of the murderer. According to trial counsel, he talked to the Petitioner about the gun, and they both agreed that it "had nothing to do with this case." Trial counsel classified evidence of the victim's gun as "a phony issue," despite trial counsel's acknowledgement that the State's theory was that the Petitioner got the gun from the victim after the victim was killed and that the Petitioner was also charged with aggravated robbery. Trial counsel confirmed that he did not make any motion in limine to keep the gun from being admitted. Trial counsel explained that the Petitioner and the victim were known to associate and that he focused instead on a defense that he considered "might appeal to a jury."

-13-

When asked about the blank SD card Debbie George gave to the police, trial counsel replied that he did not remember this piece of evidence, likely because it was not relevant to the case. Trial counsel did not object to admission of the blank SD card at trial, and furthermore, he did not "believe that there was any negative implication" to the Petitioner from its admission. Trial counsel affirmed that it may have been the State's "intention" to show that the Petitioner "was hiding or covering up things" through admission of the card.

Trial counsel was presented with Mr. Muncey's testimony at trial that Mr. Muncey had found "a pair of coveralls" in his apartment, which "the girl" said she had seen the Petitioner wearing, thus, supporting Mr. Muncey's belief that the Petitioner was setting him up for the crime. Trial counsel did not remember the identity of "the girl." In addition, trial counsel acknowledged that he did not make a hearsay objection to Mr. Muncey's mention of the girl's alleged statement about the coveralls and that he did not ask Mr. Muncey any questions about these coveralls on cross-examination. Trial counsel affirmed that he had read Mr. Muncey's written statement before trial.

Trial counsel confirmed that the TBI report indicated that no blood was found on the coveralls. Trial counsel opined that he likely did not think the issue was "extremely material," noting that the State conceded that "there was no forensic or physical evidence that connected the [Petitioner] to this crime," and that he probably hoped the jury would simply ignore the statement about the coveralls.

Trial counsel asked Destry Cobb on cross-examination at trial about what Mr. Cobb had allegedly said to Nichole Powell—that she needed "to keep quiet or she [would] end up in the river like" the victim. Trial counsel noted that Mr. Cobb denied making that statement. Although trial counsel did not believe Mr. Cobb was telling the truth, he did not call Ms. Powell to the stand to impeach Mr. Cobb.

Discovery materials, which were provided to trial counsel, included a police report concerning a domestic violence incident involving Travis Jernigan. In the report, it was relayed by Ricky Craven that Mr. Jernigan had beaten his wife Mary Jernigan allegedly because she was involved with a man named "Martin" who had been murdered. According to the report, Ricky Craven, Ms. Jernigan's father, told the officer that a man named "Johnson" from Grundy County was also involved and that he "put [a] baseball bat up Martin[']s a-- before he killed him with [the] bat." The officer wrote that he did not know whether Mr. Craven was being truthful or lying but reported the statement anyway. Trial counsel said that he placed no credence on the report and did not investigate the matter. Trial counsel added that it was not uncommon to "hear all kinds of rumors" in a "case like this."

-14-

Trial counsel also remembered reading a statement by Ms. Jernigan wherein she relayed that Dusty Cope reportedly said that "somebody should knock [the victim] in the head and take his money." Trial counsel confirmed that he did not follow-up with Ms. Jernigan's statement either and noted that it contained "double and triple hearsay statements." In addition, trial counsel noted that Mr. Cope likely would have denied making this statement to Ms. Jernigan if he had been called to testify. Furthermore, trial counsel explained that there was no credible evidence Mr. Cope had used a baseball bat to kill the victim and that no such evidence had surfaced since the Petitioner's trial. Trial counsel admitted that the Petitioner maintained his innocence, denying that he killed the victim.

Trial counsel confirmed that Troy Martin was interviewed on December 27, 2011. Mr. Martin claimed that he had spoken to Marlin Pinkard while the two men were incarcerated. Mr. Martin, during his police interview, relayed the following details of that conversation: Mr. Pinkard asserted that he arrived at "Annette's" apartment and that the victim, Dusty Cope, Jeff Johnson, Annette, Robin Holt, and Alli and Joe Piazza were present; Mr. Pinkard stated that "they had beat [the victim] with a gun for his money"; Mr. Pinkard indicated that "he had shot the victim to make sure" he was dead before throwing the victim's body, which was wrapped in plastic, off of a bridge into the river; Mr. Pinkard averred that Mr. Johnson accompanied him to the river; and Mr. Pinkard maintained that "the gun that was used" belonged to Dusty Cope. Despite Mr. Pinkard's confession, trial counsel did not feel "it was worth the effort or the time" to speak with these people because he believed that they "had absolutely nothing to do with what happened." Trial counsel opined that "nothing in [Mr. Martin's] statement matche[d] anything remotely that had to do with the actual facts of this case" and described that statement as "ridiculous."

Likewise, trial counsel "discounted" Frederick Joseph Piazza's statement about Mr. Cope, Mr. Pinkard, and Mr. Johnson because he did not find the statement to be credible. Trial counsel opined that "it would have been a waste of [his] time or anybody else's time to investigate that" because the statement did not "meet the facts of the case."

On cross-examination, trial counsel noted that despite the lack of DNA evidence, the blow to the victim's head matched the hammer found in the field behind Mr. Muncey's and Mr. Cobb's residence. Trial counsel further noted that Ms. Parker's name was engraved on the hammer. The hammer was therefore "very critical" to the case, in trial counsel's opinion. Moreover, according to trial counsel, the jailhouse conversations between the Petitioner and Ms. Parker, which were transcribed, were also harmful to the Petitioner's case. The Petitioner was heard instructing Ms. Parker to locate the hammer and dispose of it.

Steve Gauger testified that the Petitioner did construction work for him for several years, including "[o]ff and on" during the year of 2011. Mr. Gauger indicated that employment was not always "steady" and that they "were in between jobs when all of this was going on." Mr. Gauger said that when they were working on a job, he paid the Petitioner approximately $500 a week. When they were between jobs, Mr. Gauger would advance the Petitioner money "[a]t any time." Mr. Gauger explained that he usually gave the Petitioner money in $100 bills. According to Mr. Gauger, the Petitioner came to his house "[j]ust before Thanksgiving" 2011 and asked for an advance. Mr. Gauger estimated that Perry's Country Market, where the Petitioner was seen with the $100 bill, was only about two miles from Mr. Gauger's house.

Mr. Gauger claimed that he tried to contact trial counsel so he could testify on the Petitioner's behalf at trial. However, trial counsel was unavailable, and no one from trial counsel's office ever got back in touch with Mr. Gauger. Mr. Gauger admitted that he did not know the victim or of the circumstances surrounding the victim's death.

Mr. Gauger maintained that based upon his experience and interactions with the Petitioner, "the alleged conduct" was inconsistent with the Petitioner's behavior. Mr. Gauger described the Petitioner as "very family oriented" and asserted that the Petitioner would never "lay a hand on them." Mr. Gauger continued, "As far as personally, I would leave my daughter with him, and she's three years old. I mean, I've got a lot of trust for this guy and everybody else that works for me."

Frederick Joseph Piazza testified that he was familiar with the Petitioner and that the victim, whom Mr. Piazza knew, came over to his house frequently. Mr. Piazza asserted that on the day of the victim's murder, the victim, along with Mr. Cope, Mr. Johnson, and Mr. Pinkard,[2] were at his house. According to Mr. Piazza, the five of them were engaged in "illegal activities" that involved methamphetamine. Mr. Piazza did not recall seeing the victim with a gun that day, but Mr. Piazza "had heard" that the victim had one. In addition, Mr. Piazza said that he was aware that the victim had some cash on him because the victim had shown it to everyone.

Mr. Piazza testified that later that day, he drove Mr. Cope, Mr. Johnson, and Mr. Pinkard to the dam in McMinnville so that they could engage in "illegal activity." According to Mr. Piazza, they met the victim there, who had already arrived separately. Mr. Piazza did not see the victim carrying a gun or in possession of cash at that time. Mr. Piazza claimed that everyone, but him, walked down to the area underneath the bridge. Mr. Piazza said that he was in the process of leaving the area when he heard an argument

---

[2] Mr. Piazza calls this individual by the name of Marlin Pinkerton, but this appears to be the same individual referred to above as Marlin Pinkard. For the sake of consistency, we will continue to call this person Mr. Pinkard.

followed by a gunshot. Because Mr. Piazza was scared, he left. Mr. Piazza acknowledged that he did not see what happened underneath the bridge; however, that was the last time Mr. Piazza saw the victim alive.

Mr. Piazza testified that once he arrived back at his house, Mr. Cope came to his house in "soaking wet" clothes and asked to borrow a change of clothing, which Mr. Piazza provided. Mr. Piazza indicated that he ultimately burned Mr. Cope's clothes because they had been at his "house for a week and [he] didn't want to wash them."

According to Mr. Piazza, Mr. Cope and Mr. Pinkard came to Mr. Piazza's house several weeks later and threatened to kill him because he allegedly knew "too much" about what happened to the victim. Mr. Piazza said that a man named Lee Judkins intervened and stopped them from killing him.

Mr. Piazza was aware that the victim owed money to Mr. Cope, Mr. Johnson, and Mr. Pinkard. According to Mr. Piazza, the three men "were pretty upset about it" and discussed taking the money owed them from the victim.

Mr. Piazza relayed that while he had seen the Petitioner earlier on the day of the victim's murder, the Petitioner was not present at the river and that he did not see the Petitioner at any time later that day. Mr. Piazza indicated that he learned about the victim's death from reading "the papers." Mr. Piazza did not attend the Petitioner's trial.

On cross-examination, Mr. Piazza testified that he had been in trouble for assaulting someone and "driving charges." He admitted that around the time of the victim's death, he was using methamphetamine. However, Mr. Piazza claimed that he specifically remembered when the victim died because, although he was associating with methamphetamine dealers, addicts, and makers, he "was clean all of November of 2011."

The post-conviction court thereafter denied the Petitioner relief by written order filed on May 15, 2018, concluding therein that the Petitioner had failed to establish his claims of ineffective assistance of counsel. This timely appeal followed.

## ANALYSIS

On appeal, the Petitioner addresses the same issues that he raised in his amended petition and submits that the post-conviction court erred when it denied him relief. The State responds that the post-conviction court correctly concluded that the Petitioner failed to carry his burden of proving that trial counsel was ineffective.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of

Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

## I. *Failure to Investigate*

First, the Petitioner contends that "trial counsel failed to properly investigate this matter." According to the Petitioner, trial counsel was ineffective by failing to "adequately investigate and prepare" for the Petitioner's trial on his own and by failing to request funding for an investigator.

A. Funding for Investigative Services. Regarding the services of an investigator, the Petitioner notes that trial counsel testified "that there were several issues in [the Petitioner's] case that were mysterious and questionable to him" and that this was generally the standard trial counsel used to seek investigative funding in a capital case. The Petitioner also observes that trial counsel stated "that investigation into these things would have been helpful." (Emphasis removed). The Petitioner then disagrees with trial counsel's understanding of the law and trial counsel's assertion that a motion for investigative funds would not have been successful. The Petitioner contends that a "reasonable attorney" would have requested funding for an investigator because discovery "was quite extensive" and the potential witness list was long. According to the Petitioner, trial counsel, alone, "did not have the time or the resources" to thoroughly investigate the first degree murder case.

At the evidentiary hearing, trial counsel testified that at the time of the Petitioner's trial, he did not believe that he could have obtained funding for an investigator for a non-capital murder case. Trial counsel advised the Petitioner of this belief. Trial counsel also stated that he had reviewed "some recent cases" that allowed funding for an investigator in non-capital cases based on principles of equal protection and due process. Moreover, trial counsel claimed that he had "researched that issue" and still did not believe that a motion for funds to obtain an investigator would have been granted in the Petitioner's case.

-19-

Regarding the appointment of investigative or expert services for an indigent defendant, Tennessee Supreme Court Rule 13 section 5(a)(1) currently provides the following:

> In the trial and direct appeal of all criminal cases in which the defendant is entitled to appointed counsel and in the trial and appeals of post-conviction proceedings in capital cases involving indigent petitioners, the court, in an ex parte hearing, may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected.

Contrary to trial counsel's understanding, this was also the law in effect at the time of the Petitioner's trial in January of 2013. We note that Rule 13 does not allow funding for investigative services in non-capital post-conviction proceedings, but that provision is not applicable to the issue presented here. See Tenn. Sup. Ct. R. 13, § 5(a)(2). The issue is, in fact, whether trial counsel was ineffective for failing to seek funding for an investigator during the trial process; funding that is provided for by the rule regardless of the capital nature of the case. Because trial counsel's failure to seek funding was based upon his misunderstanding of the law, we conclude that trial counsel was deficient in this regard.

The Petitioner must also establish resulting prejudice from trial counsel's failure to request funds for and retain a fact investigator. We note that had funding been requested, the Petitioner would still have been required to demonstrate a "particularized need for the requested services." Tenn. Sup. Ct. R. 13, § 5(c)(1). Furthermore, there is no rule requiring defense counsel to retain an investigator in every case, even in capital cases. See, e.g., Tyrone Chalmers v. State, No. W2006-00424-CCA-R3-PD, 2008 WL 2521224, at *28 (Tenn. Crim. App. June 25, 2008) (holding that defense counsel was not ineffective in failing to retain an investigator in the petitioner's capital case).

Here, trial counsel testified that an investigator would "definitely" have been beneficial in the Petitioner's case, specifically opining that it would have been helpful to have investigated "more thoroughly" the "background and behavior and the activities" of Mr. Cobb and Mr. Muncey. Trial counsel indicated that he talked with the Petitioner about these two witnesses "numerous times," but trial counsel was unable to speak with either Mr. Muncey or Mr. Cobb before trial or obtain any pertinent information from their associates.

At trial, Mr. Cobb relayed that he had a prior conviction for "manufacture, delivery, or sale of methamphetamine" and that he was still using methamphetamine at the time of trial. Thompson, 2016 WL 7010921, at *3. He also testified that he had a prior charge for assault. In addition, Mr. Cobb testified "that he was afraid that Mr.

-20-

Muncey would be charged in connection with the victim's death," and Mr. Cobb confirmed "that he had used methamphetamine the day before the [Petitioner] asked for assistance in the robbery." Id.

Mr. Muncey testified at trial that he was using methamphetamine in November 2011. He also stated that "he had been addicted to methamphetamine for 'a very long time' and that he made his own methamphetamine." Thompson, 2016 WL 7010921, at *5. Moreover, Mr. Muncey admitted that he was incarcerated at the time of the Petitioner's trial for being a felon in possession of a handgun.

Investigator Martin testified that both Mr. Cobb and Mr. Muncey were "in the meth business." Thompson, 2016 WL 7010921, at *6. In addition, Investigator Martin confirmed that he "looked into" Mr. Cobb and Mr. Muncey in connection with the victim's murder. Id. Investigator Rowland likewise testified at trial that "he followed up on leads involving Mr. Cobb during the course of the investigation," although he did not interview Mr. Muncey. Id. at *7.

Accordingly, the jury was presented with testimony about the background and behaviors of Mr. Muncey and Mr. Cobb, including that Mr. Muncey and Mr. Cobb were also investigated in connection with the victim's murder, that they were both involved in the methamphetamine business, and that the victim had methamphetamine in his system at the time of his death. In addition to the testimony of trial counsel cited by the Petitioner, trial counsel also testified that he talked with the Petitioner about these two witnesses "numerous times," but trial counsel was unable to speak with either Mr. Muncey or Mr. Cobb before trial or obtain any pertinent information from their associates. Thus, it appears that trial counsel attempted to investigate this specific matter further but was unable to obtain any additional information. Furthermore, the Petitioner has not provided this court with any evidence of what further investigation into the background and activities of these two witnesses would have revealed. Accordingly, the Petitioner has failed to establish prejudice from trial counsel's deficient performance in this regard. See, e.g., William T. Minton v. State, No. E2015-00986-CCA-R3-PC, 2016 WL 2605782, at *6 (Tenn. Crim. App. May 4, 2016) (finding that the petitioner had failed to show that trial counsel's investigation caused the petitioner prejudice when trial counsel testified that he did not hire a private investigator because he conducted his own investigation and described the details of that investigation).

B. Trial counsel's investigation and preparation. The Petitioner submits that trial counsel's solo investigation was inadequate in the following ways:

> [T]rial counsel to[ok] no actions to corroborate or discredit anything stated by [Mr.] Cobb or [Mr.] Muncey, he took no steps to establish where [the Petitioner] could have been at the times in question, he took no steps to

-21-

establish that [Petitioner] could have had $100.00 legally, he took no steps to corroborate or discredit the issue regarding the gun, and he took no steps to follow up on any of the other statements indicating persons other than the [Petitioner] were responsible.

According to the Petitioner, "[a]ll of this could have easily been discovered prior to the trial of this matter based upon the discovery that was provided by the State." The Petitioner further notes that "[t]here was no DNA or genetic evidence that directly connected [the Petitioner] to the victim or to the purported murder weapon" and that the State's only option then "was to utilize circumstantial evidence respecting the gun, money, statements from [Mr.] Cobb and [Mr.] Muncey and the [Petitioner's] own written and recorded statements regarding a hammer with the initials, 'N.P.'" The Petitioner concludes that trial counsel's performance in this regard "was deficient so as to deprive [him] of his Sixth Amendment right to counsel."

Although trial counsel does not have an absolute duty to investigate particular facts or a certain line of defense, counsel has a duty to conduct a reasonable investigation or make a reasonable decision rendering a particular investigation unnecessary. Strickland, 466 U.S. at 691. Counsel is not required to interview every conceivable witness. See Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). Furthermore,

no particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted). There are "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Harrington v. Richter, 562 U.S. 86, 106 (2011) (quoting Strickland, 466 U.S. at 689). Cases rarely exist in which the "'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." Id. (quoting Strickland, 466 U.S. at 689).

A reasonable investigation does not require counsel to "leave no stone unturned." Perry Anthony Cribbs v. State, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *49 (Tenn. Crim. App. July 1, 2009). "Reasonableness should be guided by the circumstances of the case, including information provided by the defendant, conversations with the defendant, and consideration of readily available resources." Id. The United States Supreme Court has said, "[I]nquiry into counsel's conversations with

the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." Strickland, 466 U.S. at 691.

1. Discovery statements. Specifically, the Petitioner submits that trial counsel did not investigate various statements provided by the State in discovery materials: (1) the police report from the domestic violence incident concerning Travis Jernigan's beating his wife Mary because she was having an affair with a man named "Martin," and the statement contained therein from Ricky Craven, Mary's father, that a man named Johnson from Grundy County "put [a] baseball bat up Martin[']s a-- before he killed him with [the] bat"; (2) Mary Jernigan's police statement wherein she stated that Dusty Cope had reportedly said that "somebody should knock [the victim] in the head and take his money"; (3) the written statement of Troy Martin relaying the details of his conversation with Marlin Pinkard while the two men were incarcerated together, identifying Dustin Cope, Jeffrey Johnson, Annette West, Robin Holt, and Alli and Fredrick Joseph Piazza as being involved in the victim's murder.

Trial counsel testified that he was appointed to the Petitioner's case after the Public Defender's Office had to withdraw due to a conflict and that he prepared for the Petitioner's trial for approximately seven months. A motion for discovery had already been filed prior to trial counsel's appointment, and the Public Defender's Office gave trial counsel two boxes of discovery materials, which included a list of approximately 115 potential State witnesses, a "lot of discs," and approximately 200 pages of documents. Trial counsel testified that he had reviewed the various documents.

Trial counsel also testified that he met with the Petitioner and that they discussed which individuals trial counsel should interview. According to trial counsel, he placed no credence on the police report, and it was not uncommon to "hear all kinds of rumors" in a "case like this." Trial counsel confirmed that he did not follow-up with Ms. Jernigan's statement either and noted that it contained "double and triple hearsay statements." In addition, trial counsel maintained that Mr. Cope likely would have denied making the statement to Ms. Jernigan if he had been called to testify. Furthermore, trial counsel explained that there was no credible evidence that Mr. Cope had used a baseball bat to kill the victim and that no such evidence had surfaced since the Petitioner's trial. Despite Mr. Pinkard's confession to Mr. Martin, trial counsel did not feel "it was worth the effort or the time" to speak with these people because he believed that they "had absolutely nothing to do with what happened." Trial counsel opined that "nothing in [Mr. Martin's] statement matche[d] anything remotely that had to do with the actual facts of this case" and described that statement as "ridiculous."

We cannot conclude that evidence of these statements alone provides a sufficient basis to determine that trial counsel's investigation was deficient in this regard. The

Petitioner filed an exhibit listing the discovery materials but he did not provide the full discovery filed. The discovery file in this case apparently included statements from Marlin Pinkard, Dustin Cope, Jeffrey Johnson, Annette West, Robin Holt, and Fredrick Joseph Piazza and interviews with Mary Jernigan and Troy Martin. All these individuals were referenced in the three specific statements to which the Petitioner cites. These additional discovery materials, which the Petitioner has not provided in the post-conviction record, may have shed some light on trial counsel's decision not to pursue further investigation of the challenged witnesses and their statements. Accordingly, the Petitioner's piecemeal presentation of discovery materials is insufficient to assess the reasonableness of trial counsel's decision.

Moreover, the Petitioner did not present Mr. Cope, Mr. Craven, Ms. Jernigan, Mr. Martin, Mr. Pinkard, or Mr. Johnson at the evidentiary hearing. No reason other than the passage of time was offered for their absence. We will not speculate as to what those witnesses would have said if called to testify at trial. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Because the Petitioner did not provide the full discovery file or present any additional witnesses other than those discussed below, he has failed to establish ineffective assistance as to this allegation.

2. The victim's gun and possession of the $100 bill. The Petitioner notes that due to the lack of resources, trial counsel did not investigate "the gun issue," "referring to the gun that had been exchanged between" the Petitioner and Mr. Cobb and Mr. Muncey. According to the Petitioner, the pretrial statements of Mr. Cobb and Mr. Muncey "reveal[ed] that the two [men] were attempting to draw a connection between" the victim's death and the Petitioner's possession of that gun. The Petitioner also notes that trial counsel did not take any "steps to corroborate" the statements of Mr. Cobb and Mr. Muncey regarding the gun or whether the Petitioner "actually had the gun at any time." While discussing this alleged failure by trial counsel, the Petitioner mentions that he was charged with especially aggravated robbery in this case and that the implication at trial was that the Petitioner was in possession of the victim's gun after the victim's death.

In addition, the Petitioner asserts that trial counsel "failed to confirm whether or not [the Petitioner] was employed or otherwise had access to legal means of income." The Petitioner cites to trial counsel's testimony that the issue of the $100 bill was irrelevant and to trial counsel's corresponding failure to "ask any questions about this money or file any motions" regarding the issue. The Petitioner maintains that "it is difficult to see how the jury could 'agree with'" trial counsel that the $100 bill evidence "didn't have anything to do with this trial."

At the evidentiary hearing, trial counsel asserted that he did not find Ms. Craven's trial testimony that she purchased a gun for the victim to be relevant to the victim's murder or the identity of the murderer. Trial counsel classified evidence of the victim's

-24-

gun as "a phony issue," despite trial counsel's acknowledgement that the State's theory was that the Petitioner got the gun from the victim after the victim was killed and that the Petitioner was also charged with especially aggravated robbery. Furthermore, trial counsel testified that he did not find the proof about the Petitioner's buying things at Perry's Country Market with a $100 bill to be relevant. Trial counsel acknowledged that the State "tried to prove" that the victim "was coming into a large sum of money and that the motivation was for [the Petitioner] to kill him to get the money." When asked what "steps or efforts did [he] make to track down where [the victim's] money was going," trial counsel said, "I didn't do it because there was no evidence [the Petitioner] ever got any of that money."

First, possession of a victim's belongings following his or her death is often indicative of consciousness of guilt and relevant in a murder case, as it was here. Any argument about how a defendant came into possession of those items goes to the weight of the evidence and not its admissibility.

In addition, trial counsel's testimony that these issues were irrelevant fails to take into account that the Petitioner was also charged with felony murder and especially aggravated robbery. Importantly, on direct appeal this court found the following facts relevant to upholding the sufficiency of the convicting evidence pertaining to the Petitioner's conviction for felony murder and the underlying felony of robbery:

> [T]he [Petitioner] asked Mr. Cobb and Mr. Muncey for assistance in his plan to rob the victim of money the victim had received from a social security disability payment. The [Petitioner] planned to make the transaction look like a drug deal gone bad. Ms. Craven testified that she gave the victim $1,300 and a handgun in the days before he disappeared, and the victim bought ammunition for a .38 Special caliber weapon. Additionally, when she reported him missing, Ms. Thompson said the victim had left with money and a gun. The victim did not have any money or the gun when his body was discovered. Within days of asking for help robbing the victim, the [Petitioner] arranged to sell a .38 Special Charter Arms firearm to Mr. Cobb and Mr. Muncey. When they executed this transaction, Mr. Cobb saw the [Petitioner] with approximately $1,000 in cash in his wallet. Mr. Cobb had never known the [Petitioner] to have that much money. Additionally, around 5:00 p.m. on the day the murder was alleged to have occurred, the [Petitioner] paid for a purchase with a $100 bill. Such evidence was sufficient for the jury to conclude that the [Petitioner] intended to take property from the victim by use of violence or fear and that the victim died in the perpetration of that robbery.

Thompson, 2016 WL 7010921, at *10. Accordingly, we cannot agree with trial counsel that the Petitioner's alleged possession of the victim's gun and his payment at Perry's Country Market with a $100 bill were irrelevant issues. Trial counsel's performance was deficient in this regard.

Nonetheless, the Petitioner has not provided this court with any evidence of what further investigation into the gun issue would have revealed, including any evidence that would "corroborate or discredit" the Petitioner's possession of the victim's gun. We will not speculate. Also, the Petitioner did not testify at the hearing, and this issue certainly involves substantial questions of fact as to events in which the Petitioner participated. See Tenn. Code Ann. § 40-30-110(a). Accordingly, the Petitioner has not established his factual allegations by clear and convincing evidence.

As the Petitioner's investigation issue relates to his lawful possession of the $100 bill, the Petitioner did present the testimony of Mr. Gauger at the evidentiary hearing, which we will discuss later in this opinion. Here, we note that given the overwhelming nature of evidence indicating the Petitioner's consciousness of guilt—the sledge hammerer that had the Petitioner's girlfriend's name scratched into the head of the hammer, the mail intercepted by Investigator Rowland, and the recorded phone called placed by the Petitioner while incarcerated, we cannot say that the Petitioner has established prejudice due to any deficiency in this regard.

3. Defense Theory. The Petitioner claims that trial counsel's investigation was ineffective in the following ways: (1) trial counsel failed to adequately investigate the backgrounds of Mr. Cobb and Mr. Destry although the defense theory was that these individuals were responsible for the victim's death; and (2) trial counsel "failed to take any steps to narrow down the timeline of events" despite the importance of pinpointing the Petitioner's whereabouts during the relevant time period.

Trial counsel stated that the Petitioner's prior attorney from the Public Defender's Office "was very cooperative" and that they were able to discuss "theories of the case, the way to approach the case, that kind of thing." Trial counsel indicated that the defense theory was "that this was a meth-induced killing and that the likely suspects were Destry Cobb and Scott Muncey" and that trial strategy was to attack the credibility of these two individuals. Trial counsel opined that it "was a reasonable theory" "the killing took place at the residence of" these two men and that there was insufficient evidence the Petitioner was at the residence at that time. Trial counsel also testified that he talked with the Petitioner about these two witnesses "numerous times."

As noted above, evidence of Mr. Cobb's and Mr. Muncey's backgrounds and behavior was put in front of the jury. The jury was aware that law enforcement also investigated these two individuals in relation to the victim's murder. Again, it appears

-26-

that trial counsel attempted to investigate this specific matter further but was unable to obtain any additional information, and the Petitioner has not provided this court with any evidence of what further investigation into the background and activities of these two witnesses would have revealed.

Regarding trial counsel's failure to present an alibi defense, the Petitioner maintains that November 17 to 20 of 2011 "was not an extremely difficult period of time within which to try and account for [the Petitioner's] whereabouts." The Petitioner then notes the difficulty of establishing this evidence seven years after the fact and that locating this type of information would have been "easier" for trial counsel prior to trial.

Trial counsel testified at the evidentiary hearing that it was difficult to identify any witnesses to affirmatively establish that the Petitioner was not present at Mr. Cobb and Mr. Muncey's residence when the killing occurred because the precise date of the victim's death was undeterminable. Trial counsel opined that while he could have filed additional motions seeking information about the victim's time of death, he had received the autopsy report, and "it would have been extremely difficult, if not impossible, to have pinpointed the whereabouts of [the Petitioner] at all possible times when the [victim] was killed." Trial counsel maintained that he tried to establish an alibi defense instead through speaking with the Petitioner, Ms. Parker, and "others as to where [the Petitioner] was and his connection with the [victim]." Ultimately, trial counsel was unable to establish the Petitioner's precise whereabouts during the suspected time period of the victim's death after talking with these individuals.

The Petitioner did not present any evidence at the hearing that would dispute trial counsel's testimony and provide support for an alibi defense by accounting for his whereabouts during the relevant time period. Importantly, the Petitioner would have knowledge of his own whereabouts during the relevant time period and know of the information in this regard that he conveyed to trial counsel. However, the Petitioner did not testify at the post-conviction hearing or dispute trial counsel's testimony in any way regarding the defense theory. "[T]he Post-Conviction Procedure Act requires a petitioner to testify at the post-conviction hearing 'if the petition raises substantial questions of fact as to events in which the petitioner participated.'" Timothy Evans v. State, No. E2017-00400-CCA-R3-PC, 2018 WL 1433396, at *4 (Tenn. Crim. App. Mar. 22, 2018) (quoting Tenn. Code Ann. § 40-30-110(a) and citing Tenn. Sup. Ct. R. 28, § 8(C)(1)(b)), perm. app. denied (Tenn. July 19, 2018). The Petitioner's complaint that trial counsel failed to present an alibi witness at trial is certainly a "substantial question of fact as to events in which [Petitioner] participated." Christopher M. Heath v. State, No. M2016-01906-CCA-R3-PC, 2017 WL 3382804, at *5 (Tenn. Crim. App. Aug. 7, 2017) (citation omitted). The Petitioner has failed to establish his factual allegations with respect to this

issue by clear and convincing evidence and provides nothing but mere speculation that he had an alibi. The Petitioner is not entitled to relief.

## II. *Failure to Call Witnesses*

The Petitioner notes that "[t]rial counsel failed to subpoena or call one single witness" in support of the Petitioner's defense at trial. The Petitioner avers that "there were numerous witnesses that made various statements that could have been beneficial." The Petitioner indicates that it "was quite difficult" to "track down the witnesses for the evidentiary hearing" since these events occurred "nearly seven years ago."

However, when a petitioner contends trial counsel failed to discover, interview, or present witnesses in support of his defense, the petitioner must call those witnesses to testify at an evidentiary hearing. Black, 794 S.W.2d at 757. This is the only way the petitioner can establish that:

> (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of petitioner.

Id. Even if a petitioner is able to show counsel was deficient in the investigation of the facts or the calling of a known witness, the petitioner is not entitled to post-conviction relief unless he produces a witness at his post-conviction evidentiary hearing who "could have been found by a reasonable investigation" and "would have testified favorably in support of his defense if called." Id. at 758. Without doing this, the petitioner cannot establish the prejudice requirement of the two-prong Strickland test. Id.

Trial counsel indicated that he reviewed the State's witness list with the Petitioner and that the Petitioner requested that he speak with specific individuals, which he did. According to trial counsel, the Petitioner's previous attorney, who "had done all kinds of work," had prepared "a list of every potential witness" and "had talked to some of" the witnesses as well. Trial counsel testified that he interviewed "several" of the witnesses from the State's list, but he confirmed that he did not talk to all of the witnesses on the State's list. Trial counsel averred, however, that he did read all of the witnesses' statements and that he spoke with the witnesses that "were critical to the defense," which he determined from reviewing the "investigative facts" and during his discussions with the Petitioner. Trial counsel explained that "[ninety] percent" of the potential testimony from the State's witnesses was either cumulative, irrelevant, or immaterial, such as testimony from witnesses that were involved in the discovery of the victim's body.

-28-

The only two witnesses the Petitioner called at the evidentiary hearing were Steven Gauger and Frederick Joseph Piazza.  Throughout these proceedings, the Petitioner has cited to trial counsel's failure to present multiple witnesses at trial; however, the Petitioner offered no reason other than the passage of time for their absence at the post-conviction hearing.  Again, we will not speculate as to what those witnesses would have said if called to testify at trial.  See Black, 794 S.W.2d at 757.

As for the two witnesses the Petitioner did present at the hearing, he maintains that testimony from Mr. Gauger and Mr. Piazza was "admissible and material" because it "could have given the jury reason to doubt the State's theory of the case" and, therefore, "could have affected the outcome of this case."  The Petitioner once more indicates that "there was no direct evidence" implicating him in these crimes.

1. Mr. Gauger.  Regarding Mr. Gauger's testimony, the Petitioner asserts that trial counsel "failed to confirm whether or not [the Petitioner] was employed or otherwise had access to legal means of income."  According to the Petitioner, Mr. Gauger's testimony "would have established a response to the State's averment of money being the motive for [the Petitioner] to murder and rob [the victim]," and "[i]t would have put credible testimony before the jury to establish that [the Petitioner] had legal means of income and a valid basis for having" a $100 bill.  The Petitioner surmises that without Mr. Gauger's testimony, "[t]he jury was left only to infer that which the Court of [Criminal] Appeals found as a reasonable conclusion that [the Petitioner] 'intended to take property from the victim.'" (citing Thompson, 2016 WL 7010921, at *10).

While the Petitioner's possession of the $100 bill was relevant evidence of his guilt, we cannot say that Mr. Gauger's testimony was material and resulted in the denial of critical evidence which inured to the prejudice of the Petitioner.  Mr. Gauger testified that he usually paid the Petitioner for work with $100 bills and that he paid the Petitioner $500 a week when they worked.  According to Mr. Gauger, the Petitioner came to his house "[j]ust before Thanksgiving" 2011 and asked for an advance.  However, Mr. Gauger could not provide a specific date as to when the Petitioner made this request.

Moreover, there was evidence presented at trial that the Petitioner devised a plan to rob the victim of his social security disability payment.  Mr. Muncey testified that the Petitioner told him that the intended victim "was only going to have five grand on him," rather than the expected larger sum, and that they needed to act quickly because "his cousin [was] going through the money."  Thompson, 2016 WL 7010921, at *4.  Furthermore, Mr. Cobb testified that he saw the Petitioner with approximately $1,000 in cash in his wallet at the time the Petitioner sold him a .38 Special Charter Arms, which transaction occurred after the victim's death.  Mr. Cobb said that for the Petitioner to have this large of a sum of money in his possession was irregular.  The Petitioner also asked the victim's sister and Ms. Craven about the whereabouts of the remainder of the

victim's money. There was more than ample evidence at trial to establish that the Petitioner obtained the $100 bill through unlawful means. Besides, the Petitioner's possession of the victim's gun also established evidence of the robbery. Accordingly, we conclude that the Petitioner has failed to establish ineffective assistance due to trial counsel's failure to interview or call Mr. Gauger to the stand.

2. Mr. Piazza. As for Mr. Piazza, the Petitioner maintains that Mr. Piazza's testimony provided "relevant, admissible evidence" about other individuals that "could have been involved" in the victim's murder, those individuals being Mr. Cope, Mr. Pinkard, and Mr. Johnson. According to the Petitioner, Mr. Piazza's testimony would have provided motive for these individuals to kill the victim because the victim owed them money and would have implicated them in this crime.

We observe that there was ample evidence presented at trial that the victim had recently received disability benefits and that he was a frequent methamphetamine user. The victim's sister confirmed that the victim "was hanging around with the wrong kind of people[.]" Thompson, 2016 WL 7010921, at *1. The victim's character and background were provided for the jury. In addition, the victim was not shot but was bludgeoned with a "hard, heavy object with some force." The forensic pathologist opined that the object "would have [had] at least a semi-circular edge on one side" and that a pistol grip was an unlikely murder weapon. The sledge hammer with the Petitioner's girlfriend's name on it was consistent with the type of tool that produced the victim's injuries, and it was found at the residence of Mr. Muncey and Mr. Cobb. Mr. Piazza only stated that he heard a gunshot, but he did not witness the events that took place under the bridge.

We cannot conclude that Mr. Piazza's testimony of an incident, not sufficiently connected with the victim's demise, was material to the Petitioner's defense. At best, it provides speculative evidence of another defense theory. The discovery materials contained statements from Mr. Cope, Mr. Johnson, and Mr. Pinkard, the individuals alleged to have been involved in this incident, and those statements are not a part of the post-conviction record. The Petitioner has not shown that trial counsel's failure to interview or call Mr. Piazza to the stand resulted in the denial of critical evidence which inured to his prejudice. Black, 794 S.W.2d at 757. He is not entitled to relief from this claim.

III. *Failure to File Pretrial Motions or Object at Trial*

The Petitioner notes that "[t]rial counsel did not file one single motion in this case . . . despite the fact that trial counsel deemed much of what the State proposed to introduce into evidence as irrelevant or immaterial." The Petitioner indicates that trial counsel's performance was ineffective with respect to evidence concerning the blank SD card Debbie George gave to the police, the Petitioner's possession of the victim's gun

after the victim's death, Mr. Muncey's conveying "the girl's statement" about the coveralls found in Mr. Muncey's apartment, and the $100 bill. According to the Petitioner, "[a]ll of these issues were used circumstantially by the State to prove that [he] was guilty of the crime they alleged."

A. <u>SD card, the victim's gun, and the $100 bill</u>. The Petitioner submits that trial counsel was aware the blank SD card was going to be used by the State in its case-in-chief and notes that trial counsel testified at the evidentiary hearing that "he did not find the issue regarding the SD [card] to be relevant." Accordingly, in the Petitioner's opinion, trial counsel should have filed a motion "to have the court rule on its admissibility." The Petitioner further avers that this failure was exacerbated at trial due to trial counsel's failure to object to the introduction of the blank SD card into evidence. In support of this argument, the Petitioner observes that at trial, Captain Ramsey testified that Debbie George, Mr. Muncey's mother, had given him this blank card and that Ms. George testified that the Petitioner had "told her there were photographs on the [card] but he had erased everything on it." The Petitioner concludes that this trial testimony created the implication that he "was hiding something."

The Petitioner also remarks that trial counsel knew Mr. Muncey and Mr. Cobb were going to testify that the gun they purchased from the Petitioner belonged to the victim, and the Petitioner observes that trial counsel found the gun issue to be irrelevant. Accordingly, in the Petitioner's estimation, "trial counsel could have very well filed a motion in limine to have the court determine the admissibility of the gun" prior to trial. The Petitioner continues, "[w]hile such a motion would likely have been unsuccessful, it could have been utilized to get a greater understanding of the State's theory as to why the gun was relevant." Moreover, the Petitioner notes that trial counsel made no relevance objection at trial.

In this same regard, the Petitioner also notes that trial counsel "did not object or even question the witness" about the $100 bill. The Petitioner cites to trial counsel's testimony that the issue of the $100 bill was irrelevant and to trial counsel's corresponding failure to "ask any questions about this money or file any motions" regarding the issue. The Petitioner maintains that given these deficiencies, "it is difficult to see how the jury could 'agree with'" trial counsel that the $100-bill evidence "didn't have anything to do with this trial."

As we discussed above, we do not agree with trial counsel's opinion that the Petitioner's alleged possession of the victim's gun and the Petitioner's payment at Perry's Country Market with a $100 bill were irrelevant issues. However, the Petitioner has not provided this court with any evidence of what further cross-examination of the Perry's Country Market employee, Ms. Alvarado, would have revealed.

-31-

Also, the Petitioner acknowledges that a pretrial motion regarding his alleged possession of the victim's gun "would likely have been unsuccessful." Likewise, he has not shown how filing a pretrial motion would have provided trial counsel with "a greater understanding of the State's theory as to why the gun was relevant." Trial counsel acknowledged that, prior to trial, he was aware of the State's theory that the Petitioner got the gun from the victim after the victim was killed.

Likewise, we do not agree with trial counsel that evidence of the blank SD card was irrelevant. Ms. George testified that after Mr. Muncey was arrested on a gun charge, the Petitioner came to her house to "pay [his] respects" and give her the SD card from Mr. Muncey's phone. Thompson, 2016 WL 7010921, at *5. When Ms. George asked if there was anything on the SD card, the Petitioner responded that "the card had contained some photos but that he had erased everything that was on there." Id. This provided a relevant implication for the jury that the Petitioner was indeed hiding something. Trial counsel's concluding that this evidence was irrelevant was deficient.

The evidence the Petitioner challenges was both inculpatory and admissible. While trial counsel was operating under a mistaken belief that the evidence was irrelevant, we cannot say that the Petitioner was prejudiced by trial counsel's failure to challenge this evidence either pretrial or object during trial. As noted above, the supposed murder weapon was very distinguishing and intimately connected to the Petitioner, and the mail intercepted by Investigator Rowland and the recorded phone calls placed by the Petitioner while incarcerated indicated his consciousness of guilt. Accordingly, the Petitioner has not established that he was prejudiced from any deficiency.

B. Coveralls. In addition, the Petitioner contends that he received ineffective assistance due to trial counsel's failure to challenge the statement from "the girl" that she saw the Petitioner wearing the coveralls found in Mr. Muncey's apartment. Specifically, Mr. Muncey testified at trial that "the girl" had found "a pair of coveralls" in Mr. Muncey's apartment and that she said she had seen the Petitioner wearing them. Mr. Muncey provided this testimony in response to the question, "Anything else go on in your apartment that made you feel like you were getting set up [by the Petitioner]?"

The Petitioner contends that trial counsel "knew this issue was coming due to the fact that Mr. Muncey made this same statement in his written statement to police, which was turned over in discovery." Accordingly, the Petitioner opines that trial counsel should have filed a pretrial motion to exclude reference to the girl's statement and definitively should have made a hearsay objection at trial to Mr. Muncey's testimony about this statement. The Petitioner observes that trial counsel "appeared to be oblivious to the potential objection that could be made" and that the post-conviction court "agreed that this was hearsay and it should have been objected to at the trial."

Moreover, the Petitioner maintains that trial counsel "failed to utilize the information and evidence he had at his disposal regarding the coveralls," specifically, that "the TBI Lab Report failed to indicate the presence of blood." According to the Petitioner, "[t]rial counsel could have utilized this report to negate the inference that these coveralls were somehow part of the murder and by implication that [the Petitioner] was involved."

First, we note that trial counsel testified at the post-conviction hearing that he had read Mr. Muncey's statement prior to trial. However, the Petitioner did not enter this statement into evidence at the post-conviction hearing, and it was not entered as an exhibit at trial or listed in the discovery materials provided by the State.

Regardless, Mr. Muncey testified that the girl found the coveralls hidden in his apartment. Mr. Muncey stated that the clothes were sized "at least 4X, 3 to 4X" and did not fit him. Thompson, 2016 WL 7010921, at *4. Mr. Muncey provided this information in response to the question, "Anything else go on at your apartment that made you feel like you were getting set up [by the Petitioner]?" Mr. Muncey would have been able to supply these details to the jury regardless of the admissibility of the girl's out-of-court statement. Additionally, Mr. Muncey did not testify that he saw blood on the coveralls, and there was no testimony regarding what the Petitioner was wearing on the day the victim was killed. Besides, the Petitioner's consciousness of guilt was clearly established by his jailhouse communications, and the Petitioner's girlfriend's name was scratched into the head of the hammer. Accordingly, we cannot say that the Petitioner has established ineffective assistance as it pertains to the evidence of the coveralls.

IV. *Cumulative Effect*

To the extent the Petitioner makes a claim that the cumulative effects of trial counsel's errors somehow entitle him to relief, we cannot agree. The cumulative error doctrine recognizes that in some cases there may be multiple errors committed during the trial proceedings, which standing alone constitute harmless error; however, considered in the aggregate, these errors undermined the fairness of the trial and require a reversal. State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). We have concluded that trial counsel was deficient in certain areas—trial counsel's failure to seek an investigator based upon his misunderstanding of the law; and trial counsel's erroneous conclusions that certain evidence was irrelevant. Nonetheless, we cannot conclude that such deficiencies, when considered individually or together, resulted in prejudice in light of the strong evidence supporting the Petitioner's guilt—the Petitioner's jailhouse conversations to his girlfriend about the hammer; the letters the Petitioner sent from jail instructing his girlfriend to find and dispose of the hammer; the identifying nature of the hammer; the Petitioner's statements to the two women inquiring about the whereabouts of the victim's money; the Petitioner's behavior after the victim's death and during the ensuing investigation; the

Petitioner's knowledge of the victim's manner of death and of the crime scene; and the testimony of Mr. Muncey and Mr. Cobb about the Petitioner's plan to rob his cousin and about their exchange of the victim's gun. The Petitioner is not entitled to relief via cumulative error.

## CONCLUSION

Based upon the foregoing, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE